**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

In re: Banq Inc.

Debtor

Banq Inc.,

Appellant

v.

Creditor N9 Advisors, LLC,

Appellee

Case Nos.: 2:24-cv-02025-JAD
2:24-cv-02175-JAD

**Order Affirming Bankruptcy Court's Findings of Fact and Conclusions of Law**

[ECF No. 12, 25]
[ECF No. 10, 23]

This pair of bankruptcy appeals arises from the tangled dispute between the former officers and directors of the now-defunct cryptocurrency-neobank Banq, Inc. Following adverse developments in other cases, one faction of Banq's officers and directors filed for bankruptcy. But the bankruptcy court dismissed the petition as a bad-faith filing, finding that Banq had no business to reorganize and that the faction had filed for bankruptcy to gain an advantage in the other cases. Banq challenges that ruling, contending that the bankruptcy court erred in finding bad faith and either overlooked or failed to credit its evidence suggesting otherwise. But this court reviews a bankruptcy court's factual findings under the highly deferential clear-error standard of review, and I conclude that the bankruptcy court's findings supporting its bad-faith determination were not illogical, implausible, or without support in the record. So I affirm the bankruptcy court's ruling and close these appeals.

**Background**

George Georgiades, Kevin Lehtiniitty, Scott Purcell, and Jon Jiles once worked together at Prime Trust, an infrastructure and support-services provider for cryptocurrency websites and other financial businesses.[1] They incorporated Banq as a wholly owned subsidiary of Prime Trust to provide services for cryptocurrencies and traditional financial accounts.[2] Purcell served as Banq's CEO, while Jiles simultaneously served on the boards of Banq and Prime Trust.[3] Purcell eventually convinced Jiles to make Banq shareholder owned.[4] Jiles and his family then held a controlling equity interest in Banq.[5]

In the first two years of its existence, Banq developed a payment app and other technologies marketed to real estate, cannabis, and cryptocurrency customers.[6] But in 2021, Purcell announced that Banq was "pivoting hard to focus on NFT's" (non-fungible tokens).[7] Purcell discontinued Banq's sales, marketing, and efforts unrelated to NFTs,[8] and announced that Banq instead would develop an NFT wallet app.[9] Purcell obtained a $3 million loan in the form of an unsecured convertible promissory note payable to N9 Advisors LLC to fund the

---

[1] ECF No. 18 at 65. The ECF cites refer to Case No. 2:24-cv-02175-JAD. The same appendix of exhibits was filed in Case No. 2:24-cv-2025.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.* at 64.

[6] *Id.* at 65–66.

[7] *Id.* at 66.

[8] *Id.*

[9] *Id.*; ECF No. 15 at 19–21.

transition.[10] But a few months later, Purcell and the rest of the management team departed under highly disputed circumstances, leaving Jiles at Banq.[11]

**A. The Jiles faction alleges that Purcell ransacked the company.[12]**

Following the management team's departure, Banq filed a complaint against Purcell, Georgiades, Lehtiniitty, and two Purcell-owned companies in the United States District Court for the District of Nevada.[13] Banq alleges that, while serving as CEO of Banq, Purcell incorporated Fortress Blockchain Technologies in Delaware with Georgiades and Lehtiniitty.[14] Purcell also incorporated PlanetNFT in Nevada.[15] Concerned with these developments, Jiles called a board meeting to audit Banq's financial records and to potentially investigate these developments.[16] A few hours after Jiles called for a board meeting, Purcell announced that Apple would not list Banq's NFT application on its app store and that he was winding down the business.[17]

The board meeting nonetheless remained scheduled for a few days later, and Purcell resigned shortly before it.[18] Banq alleges that the board's subsequent investigation revealed that Purcell had secretly transferred the vast majority of Banq's employees, trade secrets, corporate

---

[10] ECF No. 18 at 66–67; ECF No. 15 at 114–127.

[11] *See* No. 18 at 67–69.

[12] These facts are taken from the complaint in the Nevada litigation, ECF No. 16 at 78, and are not intended as findings of facts.

[13] ECF No. 18 at 70; ECF No. 16 at 76 (*Banq, Inc. v. Purcell, et al.*, 2:22-cv-00773-APG-DJA (D. Nev.)).

[14] ECF No. 16 at 78–79, 84.

[15] *Id.* at 79.

[16] *Id.* at 86–87; ECF No. 18 at 68.

[17] ECF No. 16 at 86; ECF No. 18 at 68.

[18] ECF No. 16 at 86; ECF No. 18 at 68.

assets, intellectual property, and corporate opportunities to Fortress.[19] The district court, however, granted the defendants' motion to compel arbitration and closed that case.[20]

**B. N9 claims that Jiles destroyed Banq.[21]**

While Banq sued Purcell in Nevada, N9 sued Banq, Jiles, and Prime Trust in Florida's Seventeenth Judicial Circuit.[22] N9 alleged that Banq breached its promissory note and sought to accelerate Banq's repayment of the loan.[23] N9 also attempted to assert Banq's derivative claims against Jiles and Prime Trust.[24]

Those derivative claims alleged that Jiles destroyed his relationship with Purcell and Banq's management team by insisting that Purcell sign a non-compete agreement with Prime Trust (and not Banq) and threatening to terminate Banq's board of directors and assume control of Banq.[25] The claims also alleged that Jiles, through Prime Trust, imposed unrealistic compliance requirements on Banq and terminated Prime Trust's relationship with Banq when it couldn't comply.[26] Jiles then persuade other banking partners not to work with Banq and stacked a "special committee" to prevent Banq from suing Prime Trust.[27] Once Banq effectively

---

[19] ECF No. 16 at 86–100.

[20] *Id.* at 139–149. The Ninth Circuit ultimately reversed that ruling. *Banq, Inc. v. Purcell*, 2024 WL 4164126, at *1 (9th Cir. Sept. 12, 2024) (unpublished).

[21] These facts are similarly taken from the complaint in the Florida litigation, ECF No. 12 at 246, and are not intended as findings of facts.

[22] ECF No. 12 at 246.

[23] *Id.* at 247–48, 254.

[24] *Id.* at 248–56.

[25] *Id.* at 248–249.

[26] *Id.* at 250–252.

[27] *See id.*

had no business, Jiles converted Banq into a shell to sue its former management team, while exhausting Banq's remaining cash reserves.[28]

The Florida state court dismissed N9's shareholder derivative claims against Jiles, holding that N9 lacked standing because it held only a convertible promissory note and not actual shares.[29] N9 appealed that determination to the Florida Fourth District Court of Appeal.[30] N9's appeal and its direct claim for breach of promissory note were pending when Banq filed for bankruptcy protection.[31]

**C. Banq files for bankruptcy.**

Shortly after the order compelling the Nevada litigation to arbitration and N9's appeal of the Florida derivative claims, Banq filed for bankruptcy.[32] Jiles created a special-purpose entity, NVF, LLC, to loan $225,000 to Banq for the bankruptcy case in exchange for a security interest in substantially all of Banq's assets.[33] Banq claimed that it otherwise had insufficient resources to pursue the Purcell claims and owed nearly $600,000 in legal fees.[34] Banq proposed various bankruptcy plans wholly funded around pursuing the Purcell claims.[35] The plan also included releases for Banq's board of directors and a new $350,000 secured loan from NVF to pay for contingency counsel's continued pursuit of Purcell, to pay administrative claims, to fund

---

[28] *Id.* at 253–54.

[29] ECF No. 14 at 19.

[30] *Id.* at 19–20. The Florida Fourth District Court of Appeal ultimately affirmed that ruling. *N9 Advisors, LLC v. Jiles*, 423 So. 3d 427, 428 (Fla. Dist. Ct. App. 2025).

[31] ECF No. 14 at 20.

[32] ECF No. 11 at 10–109.

[33] ECF No. 18 at 70.

[34] *See, e.g.*, ECF No. 11 at 34; ECF No. 19 at 92–93, 119–120.

[35] ECF No. 19 at 96, 119–20.

business expenses, and to create a reserve to pay claims under the plan.[36] NVF and Jiles stated that they were willing to loan Banq up to $1.5 million to pursue the Purcell claims as part of the bankruptcy plan.[37] Banq also filed an adverse complaint against Purcell and the other parties to the Nevada litigation.[38]

N9 moved to dismiss, contending that Banq had filed the bankruptcy petition as an improper litigation tactic to aid its insiders.[39] N9 argued that the automatic stay would freeze the Florida litigation and allow Jiles to secure a release from Banq's derivative claims, while allowing him to forum shop by pursuing the claims behind the Nevada litigation in bankruptcy court despite the arbitration order.[40] After holding a hearing at which Banq presented witnesses, the bankruptcy court issued findings of facts and conclusions of law, determining that the court had "cause" to dismiss the petition as a bad-faith filing under 11 U.S.C. § 1112(b).[41] As the bankruptcy court succinctly summarized in the introduction to its findings of facts and conclusions of law:

> This bankruptcy case does not present the Court with a debtor in need of reorganization or financial restructuring. Debtor has been non-operational since the two-year period preceding confirmation. During that time, Debtor and its former and current executives (which the Court broadly refers to as the Jiles Parties and the Purcell Parties) have been engaged in litigation, blaming each other for Debtor's demise. It is apparent from the totality of the circumstances that Debtor's actual purpose in filing this case is not

---

[36] *Id.* at 92–93.

[37] ECF No. 18 at 169–70.

[38] ECF No. 15 at 174.

[39] ECF No. 16 at 10.

[40] *Id.* at 10–37.

[41] ECF No. 19 at 86–101.

> to successfully reorganize. It is instead to insulate the Jiles Parties from liability, and to gain an advantage in pending litigation.[42]

The bankruptcy court also issued another set of findings of facts and conclusions of law, determining that the plan was infeasible and statutorily deficient for similar reasons under 11 U.S.C. §§ 1129(a)(3), 1129(a)(5), 1129(a)(7), and 1129(a)(11).[43] The bankruptcy court then issued two short orders denying plan confirmation and dismissing the petition as a bad-faith filing.[44]

Banq now appeals both orders.

## Discussion

### A. This court has subject-matter jurisdiction over the appeals.

The underlying Nevada litigation settled during the pendency of these appeals, so N9 moves to dismiss both appeals as moot.[45] "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[46] "Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants"—"[i]f there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must

---

[42] *Id.* at 87.

[43] *Id.* at 103–126.

[44] *Id.* at 128, 130.

[45] ECF No. 25.

[46] *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976).

be dismissed for lack of jurisdiction."[47] "[T]he court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction."[48]

N9 argues that this court can provide no redress because the Purcell claims resolved. But "[t]he party asserting mootness has the heavy burden of establishing that there is no effective relief remaining for a court to provide."[49] While the court agrees that reversing the bankruptcy court now is almost pointless, the court is not convinced that no relief exists. The reorganizational plans central to these appeals expressly contemplated settlement,[50] and Banq could theoretically seek reorganization with any proceeds from the settlement. So this court retains subject matter jurisdiction over these appeals,[51] and I deny N9's motions to dismiss them.

**B. Standard of Review**

District courts review a bankruptcy court's decision to dismiss a case as a bad-faith filing for abuse of discretion.[52] That two-step standard requires that this court first review de novo whether the bankruptcy court applied the correct legal standard, then it must review the bankruptcy court's fact findings for clear error.[53] "A finding of clear error requires a 'definite and firm conviction that a mistake has been committed.'"[54] "Factual findings are clearly

---

[47] *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 520–21 (9th Cir. 1999) (cleaned up).

[48] *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

[49] *Suter v. Goedert*, 504 F.3d 982, 986 (9th Cir. 2007) (cleaned up).

[50] ECF No. 17 at 200 ("Nothing in this Plan obligates the Reorganized Debtor to pursue the Purcell Litigation Claims to the entry of a final judgment or precludes the Reorganized Debtor from accepting a reduced amount in satisfaction of the Purcell Litigation Claims through a settlement or other compromise.").

[51] The parties otherwise agree 28 U.S.C. § 158 confers this court with subject-matter jurisdiction over these bankruptcy appeals.

[52] *In re Sullivan*, 522 B.R. 604, 611 (B.A.P. 9th Cir. 2014).

[53] *Id.*

[54] *Valenzuela v. Michel*, 736 F.3d 1173, 1176 (9th Cir. 2013).

erroneous if they are illogical, implausible, or without support in the record."[55] But if "there are two permissible views of the evidence, a fact finder's choice between them cannot be clearly erroneous."[56]

**C. A bankruptcy court may dismiss a petition for cause as a bad-faith filing.**

Neither party disputes that the bankruptcy court applied the correct legal standards. Section 1112(b) authorizes a bankruptcy court to dismiss a case for cause.[57] Filing in "bad faith"—such as for "tactical reasons unrelated to reorganization"—is cause for dismissal.[58] The code does not define "bad faith," so "courts have used different approaches to determine whether a petition has been filed in bad faith."[59] Courts generally find bad faith if the petition seeks "to unreasonably deter and harass creditors"[60] or to gain an advantage in "an apparent two-party dispute that can be resolved outside of the [b]ankruptcy [c]ourt's jurisdiction,"[61] rather than "to effect[uate] a speedy, efficient reorganization on a feasible basis."[62]

The bankruptcy court in this case relied on the five-factor test originally developed by the Ninth Circuit Bankruptcy Appellate Panel in *In re St. Paul Self Storage Ltd. Partnership* to guide

---

[55] *In re Orange Cnty. Bail Bonds, Inc.*, 638 B.R. 137, 145 (B.A.P. 9th Cir. 2022).

[56] *Cooper v. Brown*, 510 F.3d 870, 919 (9th Cir. 2007).

[57] 11 U.S.C. § 1112(b); *In re Wiersma*, 227 F. App'x. 603, 607 (9th Cir. 2007).

[58] *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).

[59] *In re C&C Jewelry Mfg., Inc.*, 2001 WL 36340326, at *14 (B.A.P. 9th Cir. Apr. 14, 2009) (unpublished); 7 Collier on Bankruptcy ¶ 1112.07[1] n.8 (collecting case using different tests); *In re Marshall*, 721 F.3d 1032, 1048 (9th Cir. 2013) ("The question of a debtor's good faith depends on an amalgam of factors and not upon a specific fact . . . . the courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions." (cleaned up)).

[60] *In re Sunshine Grp., LLC*, 2020 WL 1846940, at *6 (B.A.P. 9th Cir. Apr. 10, 2020) (unpublished).

[61] *Id.*

[62] *Id.*

its bad-faith inquiry.[63] Those factors look to whether (1) the debtor has only one asset, (2) the debtor has an ongoing business to reorganize, (3) there are any unsecured creditors, (4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments, and (5) the case is essentially a two-party dispute capable of prompt adjudication in a state court.[64] If the factors suggest that "a debtor is unreasonably deterring or harassing creditors rather than attempting a speedy and feasible reorganization, the court may conclude that the petition has been filed in bad faith and dismiss it."[65] "The list is admittedly not exhaustive."[66] Courts may also "consider any factors [that] evidence an intent to abuse the judicial process and the purposes of the reorganization provisions, to make the bad faith determination."[67] "A finding of bad faith is made on a case by case basis, there is no list of factors which must be present in each case to make the finding, and the weight given to any particular factor depends on the circumstances of the individual case."[68]

Banq misstates the burden as N9's in its brief. Generally, "the party seeking relief under Section 1112(b)(1) has the initial burden of persuasion to establish that cause exists for granting such relief."[69] "However, if the issue is whether the petition was filed in good faith, the movant bears the initial burden to make a prima facie showing to support the allegation of bad faith, but

---

[63] *In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. 580, 582 (B.A.P. 9th Cir. 1995).

[64] *Id.*

[65] *Id.* at 583.

[66] *In re Mahmood*, 2017 WL 1032569, at *4 (B.A.P. 9th Cir. Mar. 17, 2017) (unpublished).

[67] *In re Marshall*, 721 F.3d at 1048; *In re Prometheus Health Imaging, Inc.*, 705 F. App'x. 626, 627 (9th Cir. 2017) (cleaned up).

[68] *In re Sunshine Grp.*, 2020 WL 1846940, at *7.

[69] *In re Baroni*, 36 F.4th 958, 966 (9th Cir. 2022).

if the movant does so, the ultimate burden rests on the bankruptcy petitioner to demonstrate good faith."[70]

**D. The bankruptcy court determined that Banq filed in bad faith.**

The bankruptcy court reviewed these factors and concluded that Banq filed in bad faith, finding that all but the third factor (the presence of unsecured creditors) reflected a bad-faith filing.[71] On the first factor (having only one asset), the bankruptcy court noted that the Purcell claims made up $17.5 million of the $17.7 million of assets reported in Banq's petition, those claims almost entirely funded the bankruptcy plan, and Banq's admitted "sole focus in this case [was] prosecuting [those claims]."[72] It thus concluded that the Purcell claims were, "in essence," Banq's only major asset despite some additional negligible assets and cash.[73]

The second factor (lack of ongoing business) and fourth factors (sources of income) similarly favored a bad-faith finding.[74] Banq was non-operational when the petition was filed, continued to be so, and would likely continue to be years after the plan's approval.[75] And Banq lacked sufficient cash flow or sources of income to sustain the plan or payments to creditors in

---

[70] 7 Collier on Bankruptcy ¶ 1112.04 (cleaned up). The Ninth Circuit and district courts within it have generally placed "the burden of proving that the petition was filed in good faith" on the debtor. *See In re Marshall*, 721 F.3d at 1048 (quoting *In re Leavitt*, 209 B.R. 935, 940 (9th Cir. BAP 1997)); *In re Greenberg*, 2017 WL 3816042, at *4 (B.A.P. 9th Cir. Aug. 31, 2017) (unpublished) ("On a motion to dismiss under § 1112(b), the debtor bears the burden to prove the chapter 11 petition was filed in good faith."); *In re Powers*, 135 B.R. 980, 997 (Bankr. C.D. Cal. 1991) ("While the Bankruptcy Code is silent regarding the burden of proof as to dismissals, courts have consistently held that once a debtor's good faith is in issue, the debtor bears the burden of proving the petition was filed in good faith.").

[71] ECF No. 19 at 95–98.

[72] *See id.* at 90, 96.

[73] *Id.* at 96.

[74] *Id.* at 96–97.

[75] *Id.* at 96.

the bankruptcy court's opinion because nothing obligated NVF to advance funds beyond $350,000 if Jiles and NVF decided they didn't want to.[76]

As to the fifth factor (essentially a two-party dispute), the bankruptcy court determined that this dispute was "in substance[,] if not in form, a two-party dispute" capable of prompt adjudication outside the bankruptcy court.[77] Besides NVF and the U.S. Trustee, N9 and Banq were the only active parties in the case.[78] Banq had also obtained contingency counsel and NVF could've funded arbitration[79] rather than adding "another unnecessary layer of administrative expense" of the bankruptcy court "to an already cash strapped Debtor."[80]

The bankruptcy court additionally noted the plan's litigation consequences. It interpreted the plan as releasing Jiles and Banq's board from the derivative claims.[81] And even if it did not, it was unlikely, in the bankruptcy court's estimation, that Banq would choose to pursue the claims against Jiles because he controlled Banq's litigation funding and the Jiles-aligned board already decided not to pursue the claims.[82] At the same time, Banq could continue to pursue Purcell through an adversarial complaint in the bankruptcy court, despite Judge Gordon's order compelling arbitration.[83] So the plan "favor[ed] . . . the Jiles Parties who benefit from cessation

[76] *Id.* at 97.

[77] *Id.* at 97–98.

[78] *Id.* at 97.

[79] *Id.* at 98.

[80] *Id.* at 120 (feasibility finding of facts and conclusions of law).

[81] *Id.* at 97–98.

[82] *Id.*

[83] *See id.* at 98.

of further litigation against them by the Purcell Parties, releases of liability, and continued prosecution of the Purcell Litigation Claims."[84]

The bankruptcy court thus concluded, as it noted in its contemporaneous feasibility finding of facts and conclusions of law, that the case "was funded by [Jiles's] special purpose entity (NVF, LLC) to (i) provide [Jiles] with a release, and (ii) overcome Judge Gordon's pre-petition Arbitration Order by instituting a new adversary proceeding. In essence, this case appears to be filed as a litigation tactic to advance the self-interest of the Jiles Parties, and more specifically, [Jiles]."[85] It thus dismissed the case as a bad-faith filing.[86]

**E. Banq's efforts to reweigh evidence and rebalance the bad-faith factors don't show that the bankruptcy court committed clear error.**

Banq asks this court to reverse the bankruptcy court's bad-faith finding, contending that its underlying factual findings were illogical and overlooked "uncontradicted" or "unrefuted" evidence. Banq first argues that it had a good-faith basis to file for bankruptcy because of the pressure it faced from the potential acceleration of N9's loan.[87] It adds that the bankruptcy court misapplied the bad-faith factors and erred in finding cause to dismiss.[88] Banq further insists that the bankruptcy court misunderstood the nature of the release and that Banq's board properly considered the Florida claims—and neither supported a finding of bad faith.[89]

---

[84] *Id.*

[85] *Id.* at 120 (feasibility finding of facts and conclusions of law).

[86] *Id.* at 139.

[87] ECF No. 10 at 31.

[88] *Id.* at 32.

[89] *Id.* at 31–32.

***1. Banq's desire to stay the Florida litigation doesn't show that Banq filed for a proper bankruptcy purpose.***

Banq argues that it filed in good faith and had a proper purpose for doing so. It reminds this court that N9's Florida litigation sought to accelerate the loan against it, and it needed the relief of bankruptcy and its automatic stay to continue its pursuit of Purcell. Banq believed that "N9 could have used [any] judgment to force Banq to terminate its remaining business operations and to cease pursuit of the Purcell Litigation Claims, which would have left Banq unable to repay any of its other creditors or to provide any return to its equity holders."[90] And the bankruptcy court "ignore[d] the evidence in the record that Banq was delinquent in payment to the two national law firms that represented it in the Nevada Litigation to whom Banq owed nearly $600,000 in legal fees."[91] Banq contends that the bankruptcy court thus erred in failing to properly credit Banq's circumstances.

Seeking relief from litigation and its costs may be a proper reason to file for bankruptcy protection.[92] "Indeed, the legislative history of the bankruptcy code makes clear that one of the purposes of the automatic stay is to give a debtor a breathing spell from his creditors during which the debtor can attempt a repayment plan, or simply be relieved of the financial pressures that drove him into bankruptcy."[93] But "[j]ust as a desire to take advantage of the protections of

---

[90] ECF No. 22 at 17.

[91] ECF No. 10 at 35.

[92] *In re Sherman*, 491 F.3d 948, 971 (9th Cir. 2007) ("There is nothing problematic about an individual filing a legitimate bankruptcy petition with the intention of taking advantage of the automatic stay provisions."); *In re James*, 260 B.R. 498, 510–11 (Bankr. D. Idaho 2001) ("The Court acknowledges that seeking relief from the costs of litigation can represent a proper basis for bankruptcy relief, and doing so is not necessarily indicative of a lack of good faith . . . . However, the Court is also aware that, in this context, the provisions . . . can be abused as well.").

[93] *In re Sherman*, 491 F.3d at 971 (quoting H.R. Rep. No. 95–595, at 340 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6296–97) (cleaned up).

the [bankruptcy code] cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law" either.[94] Given "the truism that every bankruptcy petition seeks some advantage offered in the [bankruptcy code], any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings."[95] Courts thus "universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation."[96]

The bankruptcy court thus did not err in finding bad faith despite Banq's desire to stay pending litigation. Banq seems to only speculate that N9 would have shut down the Nevada litigation.[97] The only evidence on that point that Banq cites is the testimony of Jiles and its interim CEO stating—somewhat conclusorily and without further explanation—that an adverse judgment would "result in no opportunity for recovery for any of the classes, the creditors," or "the shareholders."[98] Banq otherwise insinuated that the N9 litigation was a backdoor deal to shut down the Purcell litigation.[99] But Banq fails to parlay this statement and its finger-pointing into a clear error; the bankruptcy court was well within its discretion to believe or disbelieve

---

[94] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 127–28 (3d Cir. 2004).

[95] *Id.*

[96] *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009).

[97] Indeed, Banq and Purcell settled despite the bankruptcy court's dismissal of the bankruptcy petition as a bad-faith filing.

[98] ECF No. 18 at 146, 179 ("Q Okay. And is it your understanding that had you not made that loan through NVF, that the debtor would have had to essentially shut down his business operations and cease its pursuit of the Purcell litigation claims? A That's-- that was my belief at the time and still my belief today, yes.").

[99] ECF No. 22 at 4 ("N9 does not dispute that its affiliate Ayon participated in raising $22.5 million in funding for the Purcell Defendants' new entity that was created through the pilfering of Banq's assets, which was the reason Banq was forced to file its chapter 11 bankruptcy case."); ECF No. 10 at 36 ("It also ignores the risk that N9 could have used such a judgment to take control of the Purcell Litigation Claims away from Banq for its own benefit, leaving Banq unable to repay any other creditors."); ECF No. 10 at 43 ("N9 later filed its complaint against Mr. Jiles in the Florida Litigation on September 7, 2022 (shortly after its affiliate Ayon had participated in raising $22.5 million in capital for Fortress).").

Banq's witnesses and reject its theories. And the record supports the bankruptcy court's conclusion that Banq did not need the bankruptcy court or its automatic stay because Banq had retained contingency counsel by the time of its bankruptcy filing and secured funding from Jiles. So the desire to stay the Florida litigation did not transform Banq's petition into a good-faith filing, and the bankruptcy court did not clearly err on this point.

***2. Banq effectively had one asset.***

Banq next seeks to rebalance the bankruptcy court's bad-faith test. As to the first factor, Banq argues that the bankruptcy court's interpretation of this factor was illogical and this factor favors it because it in fact owned more than one asset.[100] It points to its cash on hand, prepayments, insurance, and its domain, software, and subsidiaries of unknown value.[101] It also claims that the bankruptcy court overlooked $11 million in net operating losses.[102]

But the Ninth Circuit's Bankruptcy Appellate Panel, including the *In re St. Paul Self Storage* panel, has not applied this factor as literally as Banq hopes—it has previously found that having just one "significant asset" can support a bad-faith finding, even if the debtor owned more than one asset.[103] While Banq does own more assets than just the Purcell claims, the fact is that the Purcell claims made up the overwhelming majority of Banq's assets.[104] And although the net

---

[100] ECF No. 10 at 45–47.

[101] *Id.* at 46.

[102] *Id.*

[103] *In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. at 582–583 (noting "[t]he Debtor's bankruptcy schedules disclose two assets" but "[t]he bankruptcy court found that Debtor's purpose in filing its petition was not to effectuate a reorganization of its business, but was a litigation tactic . . . . Moreover, its only significant asset is a claim against Appellee which was set to be tried in state court soon after the bankruptcy petition was filed"); *In re Mahmood*, 2017 WL 1032569, at *6 (affirming the finding that petitioner had "essentially" one asset as not clearly erroneous, even though debtor owned more than one asset).

[104] *See* ECF No. 11 at 22–29.

operating losses certainly have significant value on paper (as they can reduce the amount of past and future income tax owed),[105] Banq failed to adequately explain how the nonoperational Banq would realistically utilize these losses besides offsetting taxes on any recovery from the Purcell claims. The bankruptcy court thus did not act illogically in finding that Banq effectively had one asset and thus did not clearly err.

### *3. This was effectively a two-party dispute capable of resolution outside of the bankruptcy court.*

Banq similarly argues that the fifth factor favors it because the case involved more than two parties and, even if it didn't, a two-party dispute doesn't necessarily portend bad faith. Banq argues that the U.S. Trustee and NVF were active in the case, and unsecured creditors and other litigants in the Florida and Nevada litigation were waiting in the wings.[106] But NVF is a Jiles-controlled entity, and the U.S. Trustee acts as a "watchdog" in bankruptcy cases rather than a traditional party.[107] The unsecured creditors and nonparties that Banq points to were either inactive in this bankruptcy case, had a minimal stake, or were not a party. So none of these considerations shakes the bankruptcy's conclusion that this was "in substance" a two-party dispute.

---

[105] *Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at *7 (Del. Ch. Oct. 23, 2013) (unpublished) ("Creatures of the Internal Revenue Code . . . NOLs are tax losses, realized and accumulated by a corporation, that can be used to shelter future (or immediate past) income from taxation. During their 20–year lifespan, if taxable profit has been realized the NOLs operate either to provide a refund of prior taxes paid or to reduce the amount of future income tax owed." (cleaned up)).

[106] ECF No. 22 at 5–6.

[107] *See In re Castillo*, 297 F.3d 940, 950 (9th Cir. 2002) ("The United States Trustee is the 'watchdog' of the bankruptcy system.").

While it is true, as Banq argues, that "[p]etitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors," [108] a bad-faith finding is appropriate if "it is an apparent two-party dispute *that can be resolved outside of the [b]ankruptcy [c]ourt's jurisdiction*."[109] This dispute is certainly capable of resolution outside the bankruptcy court, and Banq has not shown anything that would "require the bankruptcy court's special expertise."[110] The bankruptcy court aptly noted that Banq never explained why it possessed insufficient resources to arbitrate the Nevada litigation when it already obtained contingency counsel and Jiles and NVF could've loaned it money to pursue those claims.[111] The bankruptcy court did not clearly err in applying this factor.

#### *4. Banq's remaining arguments on the bad-faith factors ask this court to impermissibly reweigh evidence.*

For the remaining factors (no business to reorganize and lack of funding), Banq contends that the bankruptcy court overlooked or didn't credit its "unrefuted" evidence. It argues that the bankruptcy court erroneously concluded that Banq lacked funds to sustain the plan because it should've believed that Jiles would've funded the plan, and contingency counsel would've recovered the necessary funds and reduced costs.[112] And while Banq concedes that it didn't have an ongoing business to reorganize, Banq believes that the bankruptcy court should've put greater weight on the "unusual consideration" that having "nearly all assets misappropriated by former

---

[108] *In re Sullivan*, 522 B.R. at 616.

[109] *Id.*

[110] *In re Mahmood*, 2017 WL 1032569, at *7.

[111] ECF No. 19 at 96–98, 120.

[112] ECF No. 22 at 11.

officers and directors can severely hurt a business's ability to maintain operations."[113] Banq also argues across these factors that the bankruptcy court's decision must be illogical or without support in the record because N9 has the burden, Banq's evidence was largely "uncontradicted" or "unrefuted," and N9 failed to rebut the testimony.

But it is a debtor that bears "the burden of proving that the petition was filed in good faith,"[114] and "the bankruptcy court was not required to give credence to [any party's] evidence."[115] And the "statutorily imposed standard does not vest [a reviewing court] with power to reweigh the evidence presented at trial in an attempt to assess which items should and which should not have been accorded credibility. [The reviewing court's] task, rather, is to determine if there exists evidence of substance to support the findings of fact of the trial court."[116]

I find that sufficient evidence supported the bankruptcy court's conclusion on these factors. The bankruptcy court determined that Banq lacked an ongoing business operation and had no realistic path back to operating in the near future.[117] Banq was nonoperational for nearly two years before the petition date, there was an "absence [of] evidence regarding its future business model or operations," and the plan itself contemplated that Banq would have no business for the next five years.[118] Banq also had no employees or physical address, and

---

113 *Id.* at 14 n.14.

114 *In re Marshall*, 721 F.3d at 1048 (quoting *In re Leavitt*, 209 B.R. at 940).

115 *In re Carnduff*, 2008 WL 8444798, at *4 (B.A.P. 9th Cir. Mar. 11, 2008) (unpublished).

116 *Cataphote Corp. v. De Soto Chem. Coatings, Inc.*, 356 F.2d 24, 26 (9th Cir. 1996).

117 ECF No. 19 at 96–98.

118 *Id.*; ECF No. 17 at 28; ECF No. 11 at 39.

dwindling cash reserves.[119] It was also reasonable for the bankruptcy court to conclude that Banq had insufficient cash flow or sources of income to sustain the proposal because the plan did not require Jiles or NVF to fund it beyond $350,000 and Banq presented no evidence regarding NVF's capability to provide funding.[120] While Jiles testified that he would provide up to $1.5 million,[121] it was entirely within the bankruptcy court's discretion to disbelieve a witness. So I find that the record supported the bankruptcy court's interpretation of these factors and, on a whole, the bankruptcy court did not clearly err in applying the bad-faith factors.[122]

##### ***5. The bankruptcy court did not clearly err in finding that the release supported its bad-faith finding.***

Nor did the bankruptcy court err in its considerations of other factors—the release and the lack of investigation into the Florida claims. The bankruptcy court found that the plan gave Jiles and the board a "full release from any potential claims" and "liability."[123] Banq argues that the

---

[119] ECF No. 11 at 25, 27, 37; ECF No. 21-1 at 7.

[120] ECF No. 19 at 125 (feasibility finding of facts and conclusions of law).

[121] ECF No. 18 at 169–170.

[122] Banq also points to the more general bad-faith factors that courts sometimes consider: (1) whether there was a misrepresentation of facts in a petition or plan, unfair manipulation of the Bankruptcy Code, or whether the debtor otherwise filed a plan or petition in an inequitable manner; (2) the debtor's history of filings and dismissal; (3) whether the debtor only intended to defeat state court litigation; and (4) the presence of egregious behavior. Banq, however, does not offer any arguments on these factors or affirmative evidence that the bankruptcy court overlooked related to them, but instead argues that N9 failed to put forward evidence to support them. But these factors were not raised before the bankruptcy court, and the bankruptcy court did not err in applying just the five-factor test. *In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. at 582–583 (finding bad faith based solely on those five-factors). Nor does N9's "failure" to put forward evidence warrant reversal as Banq bore the ultimate burden.

[123] ECF No. 19 at 97.

bankruptcy court misinterpreted the exculpatory clause and erred in finding that it supported its bad-faith finding because *Blixseth v. Credit Suisse*[124] permitted such clauses.

Generally, bankruptcy courts cannot discharge the liabilities of non-debtors.[125] The Ninth Circuit's decision in *Blixseth* permitted exculpatory clauses that are narrow in time and scope—a bankruptcy court has "the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable."[126] The *Blixseth* panel endorsed the exculpatory clause in that case because the clause applied only to conduct that occurred "during the bankruptcy proceeding, not before," and was meant to forestall "subsequent litigation over any potentially negligent actions in [the bankruptcy] proceedings."[127]

Considering *Blixseth* along with the circumstances and wording of Banq's exculpatory clause, the bankruptcy court did not clearly err in concluding that the exculpatory clause suggested bad faith. Banq's exculpatory clause releases "any and all causes of action" held by Banq "in any way related" to the Chapter 11 case and the plan "occurring on or before the confirmation date."[128] Although the clause preserves claims arising from "fraud, willful misconduct, or gross negligence" or "that may be asserted by third parties against persons or entities other than the debtor,"[129] N9 argues that, if it had been approved, Banq and Jiles would've turned around and argued that the Florida litigation claims are derivative claims that

---

[124] *Blixseth v. Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020).

[125] *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995).

[126] *Blixseth*, 961 F.3d at 1084.

[127] *Id.* at 1081.

[128] ECF No. 17 at 47.

[129] *Id.*

Banq released.[130] I find that the interaction of these clauses and what exactly they release are unclear and forestall a finding of clear error. And the temporal or scope restrictions are also questionable under *Blixseth* because the clause does not limit how far back the release goes and it can reasonably be read to apply to the events leading up to the bankruptcy petition—that is, the Florida litigation. And that would have the practical and impermissible effect of discharging the liabilities of a non-debtor (Jiles). Given these ambiguities, I cannot say that I am left with a firm and definite conviction that the bankruptcy court's consideration and interpretation of the exculpatory clause were clearly erroneous.

***6. The bankruptcy court did not clearly err in concluding that Jiles failed to investigate the claim.***

Banq finally challenges the bankruptcy court's conclusion that it insufficiently investigated the claims against Jiles and that the last-minute addition of a (hollow) investigation provision supported bad-faith. The bankruptcy court noted that "[w]hile the Plan proposes a $10,000 fund for the Subchapter V trustee to conduct an independent investigation regarding the validity and viability of the claims against the Jiles Parties," it thought it was "highly unlikely NVF" would "continue its funding of [Banq] and this case to pursue its own principal," Jiles.[131] And as the bankruptcy court further elaborated in the feasibility finding of facts and conclusions of law, it viewed the "the pretense of an independent investigation of the Jiles Claims—claims which have minimal likelihood of progressing past the investigation and consultation stages—" as part of the plan's "ultimate purpose of shielding Jiles from further prosecution of such claims

[130] ECF No. 20 at 30, 46.

[131] ECF No. 19 at 97–98.

while continuing to pursue litigation against the Purcell Parties."[132] To the extent the bankruptcy court relied on these conclusions, it was not clearly erroneous. The bankruptcy court heard testimony that Banq's board did not seriously explore the claims and no independent party investigated them.[133] Nor was the bankruptcy court's conclusion on NVF illogical or implausible given Jile's control of it.[134] So I find that the bankruptcy court did not err in considering this.[135]

## Conclusion

IT IS THEREFORE ORDERED that creditor's motions to dismiss **[ECF No. 25] in case number 2:24-cv-02025-JAD and [ECF No. 23] in case number 2:24-cv-02175-JAD are DENIED.** The bankruptcy court's decisions in case numbers 2:24-cv-02025-JAD and 2:24-cv-02175-JAD **are AFFIRMED**. The Clerk of Court is directed to **ENTER JUDGMENT ACCORDINGLY** and **CLOSE THESE CASES**.

U.S. District Judge Jennifer A. Dorsey
August 24, 2026

[132] ECF No. 19 at 122.

[133] *See* ECF No. 18 at 155, 161–163.

[134] Banq offhandedly argues that the business-judgment rule forecloses the bankruptcy court from considering the investigation. I do not reach that issue because the investigation of the Florida litigation claims made up a small portion of the bad-faith analysis and ultimately wouldn't change the outcome, but I note that a bankruptcy court generally "may infer bad faith from the totality of the surrounding circumstances." *See, e.g.*, *In re Ellsworth*, 455 B.R. 904, 921 (B.A.P. 9th Cir. 2011).

[135] Because the appeal of the bad-faith order resolves these cases, I do not reach the appeal of the feasibility order. Banq also does not challenge the bankruptcy court's decision to dismiss the petition rather than convert it into a Chapter 7 case.